The order below is hereby signed.

Signed: September 30 2021



Elizabeth L. Gunn
U.S. Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF COLUMBIA

| | |
|---|---|
| **In re** | |
| **Tanner Scott Campbell,** | Case No. 19-00042-ELG |
| **Debtor.** | |
| | Chapter 7 |

### MEMORANDUM OPINION AND ORDER DISMISSING CASE

On February 8, 2021, the Court conducted a trial on the contested motion of MoSex Exhibit 1, LLC ("MoSex") seeking dismissal of this chapter 7 case filed by Tanner Scott Campbell (the "Debtor") for cause, specifically bad faith, under 11 U.S.C. § 707(a).[1] At the conclusion of the trial, the Court took the matter under advisement. For the reasons outlined below, the Court finds that the Debtor's actions, as well as his failure to submit truthful documents, demonstrate his bad faith in filing his petition and therefore grants MoSex's Motion to Dismiss.

This Memorandum Opinion sets forth the Court's findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure.[2] The Court has

---

[1] The Court consolidated the trial of this matter with the trial on MoSex's complaint seeking denial of the Debtor's discharge under 11 U.S.C. § 727(a)(3). The Court has separately decided that the Debtor is not entitled to discharge pursuant to 11 U.S.C. § 727(a)(3). *See Memorandum Opinion*, Case No. 19-10025, ECF No. 115.

[2] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. *See* Fed. R. Bankr. P. 7052.

subject matter jurisdiction pursuant to 28 U.S.C. § 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) in which final orders or judgments may be entered by a bankruptcy judge. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1409(a).

## I. Procedural History

On January 16, 2019 (the "Petition Date"), after a prolonged period of litigation with MoSex regarding debts owed by the Debtor on a guaranty as more fully described herein, the Debtor filed a petition for relief under chapter 7. *See* Debtor's Pet., ECF No. 1. The Debtor's primary purpose of this case was to discharge a sizable non-consumer judgment owed to MoSex, his only major creditor. *See id.* (declaring the Debtor's debts to be primarily non-consumer debts and disclosing his only prepetition debts as the large debt owed to MoSex, a small credit card balance, a moderate loan balance due to his parents, and a non-dischargeable student loan obligation).

On April 19, 2019, MoSex filed a *Motion to Dismiss Chapter 7 Petition* and on May 31, 2019, filed its *Amended Motion to Dismiss Chapter 7 Petition*. ECF No. 18, 50 (together, the "Motion to Dismiss"). The Motion to Dismiss argues that the Debtor's pre- and post-petition conduct, when combined with incomplete disclosures in his petition and other filings, establish that cause exists to dismiss this case. *See generally* Mot. to Dismiss, ECF No. 50. MoSex contends that before and after the filing of the Petition, the Debtor squandered his wealth and lived an extravagant lifestyle rather than paying, at least in part, his sizeable debt to MoSex. In support of this contention, MoSex points to the Debtor's $16,000 in preferential payments made to his family in the year prior to filing his Petition, his continued and unchanged spending habits to support what it characterizes as a "lifestyle of indulgence," and his failure to truthfully account for his income

and expenses in his schedules. *Id.* at ¶ 1. For these reasons, Mosex asserts that the Debtor's bankruptcy case should be dismissed under § 707(a) for cause, specifically bad faith. *Id.*

Prior to the COVID-19 pandemic, trial on the Motion to Dismiss was set for June 2020. However, the COVID-19 pandemic combined with health issues of the Debtor resulted in a number consensual of continuances of the trial, which was finally held on February 8, 2021. Upon conclusion of the trial, the Court took the matter under advisement.

## II.    Facts

### A. The MoSex Judgment

On or about July 31, 2015, Swimmers New York, LLC ("Swimmers") entered into a commercial lease with MoSex for a restaurant space in New York City (the "Lease"), which the Debtor signed on behalf of MoSex as a "Partner". *See* Pl.'s Ex. 28, at 3, 68.[3] Concurrently, the Debtor signed a personal guaranty of the Lease (the "Guaranty"). *See* Pl.'s Ex. 29. Under the terms of the Lease, Swimmers' first rental payment was due in December 2015, but the payment was never made. *See generally* Pl.'s Exs. 13-15 (MoSex's various eviction complaints). Though the Debtor at various times stated under oath and penalty of perjury that this rent was paid via wire transfer to MoSex, the Debtor acknowledged at trial the payment was not made. *See e.g.*, Pl.'s Ex. 2 ¶ 6. Accordingly, MoSex began proceedings to terminate and enforce the terms of the Lease and the Guaranty in the Supreme Court of the State of New York, County of New York (the "New York Court") in early 2016. *See generally* Pl.'s Exs. 13-15.[4]

---

[3] MoSex's exhibits are attached to ECF No. 121.

[4] There was significant litigation in the New York Court, the details of which are not material to the issues herein, and therefore, this opinion does not detail the entirety of those proceedings, only those relevant to the ultimate judgment entered against the Debtor.

On September 8, 2016, the New York Court entered summary judgment against the Debtor with respect to liability under the Lease and Guaranty, and on May 11, 2017, a judgment in the amount of $431,127.00, plus $165,000.00 in attorneys' fees and $49,431.96 of pre-judgment interest on the principal amount from February 1, 2016, for a total of $645,558.96 (the "Judgment"). Pl.'s Ex. 6, 9. In November 2017, after the Debtor relocated from New York to Washington, D.C., MoSex registered the Judgment in the District of Columbia Superior Court (the "Domestication") and began collection efforts.[5] Pl.'s Ex. 10. Shortly thereafter, the Debtor filed his Petition.

***B. The Debtor's Background & Extravagant Lifestyle***

Mr. Campbell is not a "stereotypical" chapter 7 debtor. He earned a bachelor's degree from Cornell University and a master's degree from Columbia University. *See* Pl.'s Ex. 31. Since completing his education, the Debtor has held multiple executive-level positions with six-figure salaries.[6] *See* Pl.'s Ex. 31; *accord* Pl.'s Ex. 52 (Debtor's Production). For the two years prior to the Petition Date, his combined scheduled income was $524,318.69. ECF No. 33. Mr. Campbell has no dependents to support and lives (at a minimum) an upper-middle class lifestyle in downtown Washington, D.C. *See* Schedule J, ECF No. 1. Prior to living in Washington, D.C., the Debtor resided in New York City. Pl.'s Ex. 53 at 39:9, ECF No. 121.

The Debtor resides in an apartment in the downtown metropolitan D.C. area with a monthly rent of $2,995.00, does not own a vehicle but incurs monthly scheduled transportation costs (i.e.

---

[5] In order to domesticate the judgment, MoSex had to attempt service on the Debtor numerous times.

[6] While high salaries are not prohibitive or preclusive of an individual filing a chapter 7 case, the Debtor's filing deviates from the "normal" case. *See In re Snyder*, 509 B.R. 945 (Bankr. D.N.M. 2014) (finding that, while the debtor made over $290,000 a year, his chapter 7 filing was appropriate to relieve himself of non-consumer debts and protect his retirement savings).

Uber, Lyft, Metro) of $1,200.00,[7] owns a dog with scheduled monthly expenses of $600.00, reported scheduled "food and housekeeping" of $1,200.00, and scheduled an additional $1,200.00 of "Business entertainment" as part of his overall scheduled monthly expenses of $9,550.00.[8] In addition, the Debtor belongs to The Metropolitan Club, a private club, with monthly dues of $300.00 and additional meal costs, although it is not clear from the record whether the $1,200.00 food costs included such expenses. *See* Pl.'s Ex. 26, ECF No. 121 (detailing the Debtor's monthly dues to The Metropolitan Club). Based upon the evidence introduced at trial and the testimony of the Debtor, it is clear that the Court cannot rely on the Debtor's schedules as an accurate representation of his actual spending or monthly expenses. Even discounting the inability to account for a significant portion of the Debtor's income due to cash expenditures, as discussed below, a cursory review of the Debtor's bank statements provides evidence of the Debtor's profligate spending habits. For example, one month prior to filing for bankruptcy, the Debtor spent over the course of *one day* $489.20 at a restaurant, $118.23 in Uber trips, and $483.00 at a liquor store. Pl.'s Ex. 18 at 204-5, ECF No. 121. In addition to dining out and transportation, other days reflect multiple large purchases at high-end clothing and accessory stores.

In addition, notwithstanding the evidence introduced as to his actual spending, the Debtor's scheduled expenses include $1,000 monthly for student loan repayment, but at trial the Debtor admitted that he did not, and had not for many years, make payments on his loans. The Debtor argued that the un-paid payments were still a valid expense to be included in his schedules because

---

[7] Due to the Debtor's excessive cash usage, including testimony that he would use cash for cabs, it is entirely possible his transportation costs exceed even the $1,200 included in his schedules.

[8] As the Court notes below, the Debtor's monthly spending is likely much higher given his scheduled budget surplus but, due to the Debtor's failure to keep records or recall any specific use of any of his cash withdrawals, these are the only available figures in the record.

they were due.[9] The Debtor's failure to make the student loan payments either pre- or post-petition while scheduling the same results in another $1,000 of unaccounted for *actual* spending by Debtor.

Even with the Debtor's higher than average monthly living expenses (including the $1,000 attributed to student loan payments), the Debtor's Schedule J lists a monthly budget surplus of $3,157.[10] *See* Debtor's Pet., at 24-27 of 46 (Schedule I & J), ECF No. 1. However, neither the Debtor's schedules, monthly bank statements, or testimony at trial provide any accounting of the spending of the surplus. At the same time, the Debtor does not have a steadily growing bank account balance reflecting any savings thereof. *See generally* Pl.'s Exs. 18A & B (Aspect LLC's Monthly Bank Statements). The Debtor testified at trial that despite the lack of disclosure in his official Schedules, he spent and continued to spend the scheduled surplus on what he vaguely described "business-related expenses" (in addition to those actually scheduled) and "daily" on his girlfriend. Much of the Debtor's additional spending of any surplus is untraceable as the Debtor's spending is primarily through cash withdrawn from the bank and for which receipts or other records were not maintained. Thus, all of the Debtor's disclosures (filed under penalty of perjury) indicate a monthly surplus, meaning the disclosures filed in this case were, and remain, inaccurate.

In arguing that this case should be dismissed for cause, MoSex points heavily to the Debtor's continued inability or refusal to explain the usage of the money obtained from his large and frequent ATM cash withdrawals despite the requirements for full and complete disclosures of

---

[9] Debtors have made similar, unpersuasive arguments with regard to scheduled car expenses even when the Debtor did not own a car. Courts have repeatedly dismissed this position. A debtor's ability to have an expense, or such as a student loan, does not result in an allowable deduction if the cost is not actually incurred as an expense. *See In re Feagan*, 549 B.R. 811, 815 (Bankr. N.D. Ga. 2016); *In re Sires*, 511 B.R. 719, 723 (Bankr. S.D. Ga. 2014); *In re Hardacre*, 338 B.R. 718, 728 (Bankr. N.D. Tex. 2006).

[10] Income from Schedule I of $12,707 less Schedule J expenses of $9,550. If the phantom student loan payments are removed from his expenses, the Debtor's surplus would rise to $4,157.

income and expenses. Even after a review of all of the evidence and testimony in this case, the Court is unable to determine whether the use of the cash (i) is consistent with an honest, but unfortunate debtor; (ii) created otherwise preferential or avoidable transfers; (iii) represented excessive or otherwise impermissible spending for a chapter 7 debtor; or (iv) make any other interpretation or inference (positive or negative) therefrom.

What is clear from the record is that the Debtor made nearly 1,000 ATM withdraws over 53 months. *See* Pl.'s Ex. 17 (Spreadsheet of Debtor's Bank Transactions). Notably, between January 2015 to May 2019, the Debtor withdrew an average of $3,966.59 from ATMs every month, without any record of the disposition or use of the funds. The Court finds it significant that the Debtor's scheduled budget surplus is less than $200.00 different than his average ATM withdrawal total. Even more concerning is the Debtor's pattern and usage of the withdrawn cash without any accounting continued seemingly unabated post-petition. *See* Pl.'s Ex. 53, Debtor's Dep. at 139-48 (wherein the Debtor testified to withdrawing a couple hundred dollars the night before the deposition but could not, or would not, explain what he did with that money). Even at trial, the Debtor continued to only provide a high-level explanation for his *pattern* of ATM withdrawals as necessary for "various business and personal expenses", but declined upon multiple rounds of questioning to provide details for any specific ATM withdrawal, batches of withdrawals, or even a more detailed list of uses. Instead, the Court is left to speculate just what those "business and personal expenses" might entail, how they might affect or alter his filed schedules, and what actually happened to approximately 25 percent of his monthly income. The Debtor's lack of candor to the Court at trial and in his schedules combined with his failure to even attempt to provide any details as to the use of his cash significantly undermines the credibility of his testimony, which the Court takes into consideration when evaluating whether or not cause exists to dismiss this case.

### *C. The Debtor's Pre-Petition Payments to Insiders*

Pre-petition the Debtor received significant financial support from his family. In his amended Schedules and Statement of Financial Affairs, the Debtor indicated that as far back as "mid-2015" his parents lent him $50,000 "on a revolving credit line basis" to support him while he was between jobs. *See* Debtor's Witness List Ex. B, ECF No. 116. At trial, no contract or any other any writing establishing or setting forth the terms of the purported loan(s) was introduced. Rather, the Debtor merely offered a "Loan Payment History" reflecting amounts loaned from and repayments made to his parents beginning on December 17, 2017— after the Domestication of the MoSex Judgment. *See id.* Ex. A, ECF No. 115.[11] No evidence or testimony was introduced setting for any loan or repayment history for the familial loan prior to December 17, 2017. Based upon the payment history and testimony at trial, the Debtor's practice, post-Domestication, was to pay his parents an average of $1,000 each month without consistency as "loan repayments," apparently when he had "extra" money. *See id.* In reality, the payment history details that in some months the Debtor made no payment while in others he paid as much as $6,000. *Id.*

Despite the outstanding $30,000 allegedly owed to his parents in September 2018, the Debtor borrowed an *additional* $12,000 from his parents over the four months immediately prior to filing his Petition, while concurrently paying them back $9,000. *Id.* In addition, the Debtor also paid his parents a total of $7,000 between four- and twelve-months pre-petition, for total payment of $16,000 during the 1-year insider preference period. *Id.* The Debtor's amended Schedules disclosed a net $3,000 in preferential payments to Vicki Campbell during the 90-day non-insider

---

[11] The Court notes, however, that the Debtor and both of his parents tended to corroborate these "bridge loans" during their depositions which were admitted into evidence. *See* Pl.'s Ex. 53, at 49:22-50:2 (Mrs. Campbell's Deposition). *Accord* Pl.'s Ex. 54, at 41:23-25 (Mr. Campbell's Deposition); Pl.'s Ex. 55, at 133-35, 208-10, 23-39 (Debtor's Deposition).

preference period, though the Debtor's counsel later identified the preferential amount as $4,000 *See* ECF No. 33, Ex. B. While the actual amounts are not determinative, the Debtor's decision to make significant payments to an insider in the months immediately pre-petition in lieu of paying on the Judgment combined with his extravagant spending, is material in evaluating whether the Debtor filed this case in bad faith.

### III. Legal Standard

*A. Bad Faith as Cause for Dismissal under § 707(a)*

"The principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor.'" *Marrama v. Citizens Bank*, 549 U.S. 365, 367 (2007) (quoting *Grogan* v. *Garner*, 498 U.S. 279, 286, 287 (1991)). Inherent in the concept of the 'honest debtor' are the attributes of "[g]ood faith and candor," which "are necessary prerequisites" to any bankruptcy filing. *In re Zick*, 931 F.2d 1124, 1129–30 (6th Cir. 1991). A chapter 7 case may be dismissed upon the motion of a creditor under § 707. *See In re Fleurantin*, 420 F. App'x 194, 197 (3d Cir. 2011). In the case of a debtor with primarily non-consumer debts, the only basis for dismissal is under § 707(a), for cause. *Piazza v. Nueterra Healthcare Physical Therapy, LLC (In re Piazza)*, 719 F.3d 1253, 1266 (11th Cir. 2013).[12] Section 707(a) and provides a non-exhaustive list of three types of cause in a non-primarily consumer debts case: (1) unreasonable delay by the debtor; (2) nonpayment of fees or charges; and (3) failure to comply with § 521(a) requirements. 11 U.S.C. § 707(a); *Innovative Bldg. Sols., LLC v. Moser (In re Moser)*, 628 B.R. 756, 763 (Bankr. W.D. Pa. 2021). However, bankruptcy courts "routinely treat dismissal for prepetition bad-faith conduct as implicitly authorized by the words 'for cause.'" *Marrama*, 549 U.S. at 373. In addition, each circuit

---

[12] Dismissals pursuant to § 707(b), as amended by Congress in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, are limited to cases where the debtor's debts are primarily consumer debts as defined by 11 U.S.C. § 101(8).

court that has addressed the question has found that bad faith to continues to be cause for dismissal under § 707(a) after the BAPCPA amendments to § 707(b). *See In re Piazza*, 719 F.3d at 1260-61 ("[T]he power to dismiss 'for cause' in § 707(a) includes the power to involuntarily dismiss a Chapter 7 case based on prepetition bad faith."); *In re Zick*, 931 F.2d 1124, 1127 (6th Cir. 1991) ("[L]ack of good faith is a valid basis of decision in a 'for cause' dismissal by a bankruptcy court."); *Krueger v. Torres (In re Krueger)*, 812 F.3d 365, 370 (5th Cir. 2016) ("[A] debtor's bad faith in the bankruptcy process can serve as the basis of a dismissal 'for cause' . . . ."); *Perlin v. Hitachi Capital Am. Corp. (In re Perlin)*, 497 F.3d 364 (3d Cir. 2007); *see, e.g., In re Tamecki*, 229 F.3d 205, 207 (3d Cir. 2000) ("Section 707(a) allows a bankruptcy court to dismiss a petition for cause if the petitioner fails to demonstrate his good faith in filing."); *Janvey*, 883 F.3d at 412 ("[T]he majority view is the sounder one, because it is the most helpful in preventing serious abuses of the bankruptcy process."); *In re Schwartz*, 799 F.3d 760, 764 (7th Cir. 2015) (agreeing "with the cases that allow 'for cause' to embrace conduct that . . . avoids repayment of debt without an adequate reason" but noting with disapproval that such "cases often use 'bad faith' to denote 'cause' for dismissing a bankruptcy petition . . . but we can't see what is gained by the terminological substitution").

"The concept of bad faith 'does not lend itself to a strict formula,'" *Janvey*, 883 F.3d at 412 (quoting *Piazza*, 719 F.3d at 1271), and "[c]ourts must consider the totality of the circumstances underlying each case to determine whether a debtor has acted in bad faith." *Id.* A decision to dismiss for cause is discretionary and guided by equitable principles. *Smith v. Geltzer*, 507 F.3d 64, 73 (2d Cir. 2007) (citing *In re Hull*, 339 B.R. 304, 308 (Bankr. E.D.N.Y. 2006) (finding that a bankruptcy court has substantial discretion in ruling on § 707(a) motions to dismiss)). In other words:

> Dismissal based on lack of good faith must be undertaken on an ad hoc basis. It should be confined carefully and is generally utilized only in those egregious cases that entail concealed or misrepresented assets and/or sources of income, and excessive and continued expenditures, lavish lifestyle, and intention to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence.

*Zick*, 931 F.2d at 1129 (citation omitted).

In order to identify the circumstances that are likely to be relevant in such a totality of the circumstances determination, courts have developed a number of multi-factor tests listing examples of conduct that may constitute bad faith. *Janvey*, 883 F.3d at 412 (citing examples). After a thorough review of the majority of the multi-factor tests, the following factors stand out to this Court as those most relevant and appropriate to a totality of the circumstances determination under § 707(a):

> (1) the improper or unexplained transfers of assets prior to filing;
> (2) the debtor's lack of candor and completeness in statements and schedules, such as misstatements of assets, income or expenses to disguise financial condition of debtor or estate;
> (3) the debtor has sufficient resources to repay debt(s) that stand to be discharged;
> (4) the debtor failed to attempt to repay creditors, despite having means to do so;
> (5) the debtor maintains a lavish lifestyle, with excessive expenditures;
> (6) the debtor's use of bankruptcy relief would be unfair to creditors and inconsistent with the fundamental purpose of bankruptcy to afford a fresh start to an honest but unfortunate debtor, including, but not limited to whether:
>> (a) the debtor's petition is part of a pattern to evade a single creditor;
>> (b) the debtor paid all but one creditor prior to filing the petition; and
>> (c) the debtor paid insider creditors prior to filing the petition.[13]

As with each of the multi-factor tests utilized in other cases, no one factor herein is determinative. Essentially, the factors assist the court in determining whether, under the totality of the

---

[13] *See Piazza*, 719 F.3d at 1273-74 (the debtor's bankruptcy filing was designed to avoid the payment of a single large debt while continuing to pay insiders); *McDow*, 295 B.R. at 74 (a debtor's failure to pay fee, meet deadlines, payments to insider creditors, and unreasonable delay weigh in favor of a dismissal due to bad faith); *In re Lombardo*, 370 B.R. 506, 512 (Bankr. E.D.N.Y. 2007); *In re Aiello*, 428 B.R. 296, 302 (Bankr. E.D.N.Y. 2010); *In re Cisneros*, No. 21-12338, 2021 LEXIS 2324 at *16 (Bankr. D. Md. 2021) (citing the *McDow* factors).

circumstances, a debtor's actions violate the spirit of the Code's fresh start. *See Am. Zurich Ins. Co. v. Hardin (In re Hardin)*, 616 B.R. 198, 207 (Bankr. N.D. Ga. 2020).

### *B. Cause Exists to Dismiss this Case for Bad Faith*

In conducting its totality of the circumstances analysis under § 707(a), the Court applies each of the bad faith factors enumerated *supra* to the facts and circumstances of the Debtor's case. In order to find bad faith, the Court need not find all factors applicable, but must weigh each within the specific context of the case. In order to find bad faith, the Court need not find all factors applicable, but must weigh each within the specific context of the case. Based upon the analysis of the factors, the Court finds that each of the enumerated factors weighs in favor of a finding of bad faith and, therefore, cause exists to dismiss this case under § 707(a).

    i.    *Improper or Unexplained Pre-Petition Transfers*

Many questions still exist surrounding the Debtor's reasoning and pattern of making mostly daily, if not multiple times a day, cash withdrawals prior to his bankruptcy filing.[14] The Debtor withdrew, on average, $3,966.59 per month with no recordation or explanation of where this money went. *See* Pl.'s Ex. 17, ECF No. 121. In addition to these ATM withdrawals, the Debtor made $16,000.00 in preferential payments to his mother on his familial loan in the year immediately preceding the filing of his chapter 7 petition. *See* Debtor's Witness List Ex. A, ECF No. 115. Undoubtedly there was no urgency for his mother to receive this money as his family simultaneously loaned the Debtor an additional $12,000.00 and had been loaning the Debtor money for more than three years prior. *See id.* The Debtor made these payments to his mother all the while eluding payment on and collection efforts by MoSex on the Judgment. In addition, the

---

[14] The Court notes that the Debtor continued to make these withdrawals post-petition but, for the purposes of this prong of the analysis, such actions are not relevant.

Court can only infer from the Debtor's lack of candor with respect to the use and disposition of the cash withdrawals, that there is a significant possibility that part of those funds were also used, at a minimum in part, for improper purposes. When combined with the Debtor's payments to an insider, his mother, immediately preceding his bankruptcy filing, and after consideration of all the relevant evidence, this factor weighs in favor of a finding of bad faith § 707(a). *See In re Woody*, 578 B.R. 739, 746 (Bankr. M.D.N.C. 2017); *In re O'Brien*, 328 B.R. 669, 675 (Bankr. W.D.N.Y. 2005); *see also In re Brown*, 88 B.R. 280, 284 (Bankr. D. Hawaii 1988) (finding a lack of good faith where the debtor transferred business profits to avoid paying a judgment).

    ii.    *The Debtor's Lack of Candor in his Filings*

The Court has detailed extensively, *supra*, the material misstatements and omissions from the Debtor's schedules and statements regarding his student loan payments and use/disposition of his cash withdrawals. Despite the inaccuracies in the filings, the Court provided the Debtor with multiple opportunities at trial to further explain or clarify his filings, and he failed to provide any further information or detail. Thus, the Debtor's failure to keep adequate records, combined with the admitted inaccuracies in his Schedules, demonstrates clear lack of candor by the Debtor in his filings and weighs in favor of a finding of bad faith. *See In re Johnson*, 546 B.R. 83, 159 (Bankr. S.D. Ohio 2016).

    iii.    *The Sufficiency of the Debtor's Resources to Repay Debts*

The Debtor is a healthy, ivy league educated man with no dependents who routinely had six-figure annual income. For example, the Debtor's annual income for 2018, the year immediately preceding his bankruptcy filing, was $299,106.12. Debtor's Pet., ECF No. 1. Further, in his sworn schedules with the Court, the Debtor's indicated a monthly surplus of $3,157.00 even after

application of above-average expense.[15] The Court need look no further than the Debtor's own sworn statements to determine that, on paper, the Debtor clearly has the ability to repay his debts. In lieu of dedicating his surplus income to satisfying his debts, the Debtor instead apparently spent the money via a series of regular, large, untraceable and unaccounted cash withdrawals. This factor clearly weighs in favor of a finding of bad faith. *In re Blumenberg*, 263 B.R. at 715.

    iv.    The Debtor's Failure to Attempt to Repay Creditors

At the time of his bankruptcy filing, the Debtor had been aware of the $645,558.96 Judgment for almost two years having participated in the New York Court and apparently having taken affirmative efforts to avoid service of collection documents. In that time, the Debtor made no payments on his debt to Mosex and, instead, chose to pay off family debts and engage in excessive spending. *See* Pl.'s Ex. 17, ECF No. 121. Unlike MoSex, the Debtor had no problem paying his familial loan. Had the Debtor's practice from the initial loan agreement to petition date been that of his reported pattern spanning from December 2017 to May 2019 (paying $1,000.00 a month), the Debtor may have paid about $40,000.00 to his family by the petition date—not only $16,000.00 disclosed in the Loan Payment History. *See* Debtor's Ex. B (assuming "mid-2015" means June or July). Without any evidence the Court can only infer that at least one of the following may have happened: (1) the Debtor began paying his family loan with greater fervor post-Domestication than he had pre-Domestication or (2) the Debtor borrowed far more money than the initial purported $50,000.00 on a "revolving door" basis pre-Domestication that he only began to pay back post-Domestication. In either event, the Debtor clearly chose to make payments only to his familial debt, to the exclusion of MoSex.

---

[15] Had the Debtor been truthful in his schedules and omitted the student loan payment of $1,000, his Schedules would accurately reflect a $4,157 monthly surplus.

Additionally, despite conceding their validity, the Debtor claimed he "did not know how to make payments" and simply chose not to make payments towards his other significant debt - his student loans. Unlike the familial loans, the student loans are a nondischargeable obligation under 11 U.S.C. § 523(a)(8). Thus, the Debtor's choice to pay his familial loans instead of a nondischargeable obligation in the months preceding the filing of this case also shows an unmistakable affirmative choice to pay his insider debts over other obligations, even when in the "zone of insolvency". *See* 11 U.S.C. § 547(f) ("the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of a petition"). The Debtor's clear lack of any payments on legitimate third-party debts makes it clear that this factor weighs in favor of a finding of bad faith.

    v.    *The Debtor's Lavish Lifestyle*

As detailed above, the Debtor resides in a high-end apartment, maintains an expensive pet, choses private transportation over public transportation, spends a minimum of $1,200 per month ($40/day) on food including dining out frequently and private club memberships, and incurs an equal amount in uncategorized or described "business expenses." All of that before considering the remaining unanswered question of where close to $4,000 per month in cash is spent. The record clearly establishes that despite filing for chapter 7 the Debtor has made no lifestyle changes after filing his petition. Indeed, the Debtor's spending history contained in the record demonstrates his propensity for lavish purchases, amenities and injudiciously spending thousands of dollars of cash a month. While these facts alone may+ not sufficient to establish bad faith, they clearly establish that he was and is capable of making payments to MoSex and instead used such funds to fund a lavish, if not extravagant, lifestyle. *See Piazza*, 719 F.3d at 1260. This factor weighs heavily in favor of a finding of bad faith.

  *vi.*  *Fairness to Creditors in Allowing the Debtor to Utilize Bankruptcy Remedies*

At trial, it became evident that, were it not for MoSex's Judgment, the Debtor would not have filed for bankruptcy. In filing for bankruptcy, the Debtor hoped to impermissibly use the bankruptcy system to avoid the payment of one debt: the Judgment. *See Janvey v. Romero*, 883 F.3d at 412. As such, this stated sole motivation for filing his petition is not one of an "honest but unfortunate debtor," but rather, a debtor hoping to avoid paying a single judgment while maintaining the remainder of his extravagant lifestyle. *Grogan*, 498 U.S. at 287. In addition to his stated motivations for filing, the Debtor chose to repay his familial loans in lieu of making payments on the Judgement, to purchase numerous luxury goods, to travel and eat out in expensive restaurants. Indeed, the Debtor's payments to his mother constitute insider payments, another factor signifying bad faith in filing for bankruptcy. *See In re O'Brien*, 328 B.R. 669, 675 (Bankr. W.D.N.Y. 2005). As the Court started its analysis with, bankruptcy is intended for the honest but unfortunate debtor, as evidenced by the Debtor's actions both pre- and post-petition, this Debtor is anything but. This factor clearly weighs in favor of a finding of bad faith.

## IV. Conclusion

If anything is clear from the totality of the circumstances and record in this case, it is that the Debtor is anything but the "honest but unfortunate" debtor for which bankruptcy is intended. An analysis of each of the factors to identified for the Court to consider in evaluating whether a chapter 7 case was filed in bad faith weighs in favor of a finding that this case was filed in bad faith. The Debtor's lack of candor in both his written pleadings and at trial, the payments to insiders, but particularly the Debtor's unfettered, extravagant spending, further support the Court's conclusion. There was nothing honest nor unfortunate about the Debtor either pre- or post-petition.

Therefore, based upon the foregoing, the Court finds that the Debtor acted in bad faith in filing the instant chapter 7 petition and, accordingly, GRANTS MoSex's Motion to Dismiss pursuant to 11 U.S.C. § 707(a).

[Signed and dated above.]

Copy to: the Debtor; all counsel of record